IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MAYA SWIMWEAR, CORP. and )
CAROLINA DINARDI, )
                                                 )
        Plaintiffs, )
                                                 )
   v. ) Civ. No. 11-059-SLR
                                               )
MAYA SWIMWEAR, LLC., )
DAVID MCKINNEY, and TODD FORD, )
                                               )
        Defendants. )

Neil Lapinski, Esquire, and Theodore Kittila, Esquire, of Elliot Greenleaf, Wilmington, Delaware. Counsel for Plaintiff.

David E. Wilks, Esquire, of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: June 8, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Carolina Dinardi ("Dinardi") and Maya Swimwear Corp. ("Maya Agentina") (collectively "plaintiffs") filed this action against David McKinney ("MicKinney"), Todd Ford ("Ford"), and Maya Swimwear LLC ("Maya USA") (collectively "defendants"), on January 15, 2011. (D.I. 1) Plaintiffs design, manufacture, and distribute an exclusive line of bikinis under the "Maya" brand name. (D.I. 8 at 1-2, 7-8) Defendants sell genuine, prior year Maya brand bikinis via their website.[1] (D.I. 20 at ¶¶ 10) In their second amended complaint, plaintiffs allege that defendants improperly use plaintiffs' "Maya" trademark in connection with the sale of bikinis in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, and that said use of the mark misdescribes the bikinis and falsely designates their origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (D.I. 14 at ¶¶ 37-40) In addition to the § 43(a) claims, plaintiffs allege that defendants are tortiously interfering with a contractual relationship by harassing Christina Pinto ("Pinto"), a former employee of defendants who now works for plaintiffs. (Id. at ¶¶ 41-52) Currently pending before the court is plaintiffs' motion for a preliminary injunction based on its trademark and false advertising claims, and defendants' motion to dismiss for failure to state a claim. (D.I. 8; D.I. 16) The court held a hearing addressing plaintiffs' motion on April 11, 2011. For the following reasons, the court grants-in-part and denies-in-part both motions.

---

[1] Defendants' website is www.buymaya.com. A Google search for "Maya swimwear" returns defendants' website as the second result on the list, with plaintiffs' www.mayaswimear.com being the first. Plaintiffs also operate an e-commerce website that allows customers to purchase Maya bikinis. Its URL is www.buymayaswimwear.com.

## II. BACKGROUND

### B. The Parties and Contested Use of The Mark

Dinardi is the owner of Maya Argentina, a Florida corporation with its principal place of business in Buenos Ares, Argentina. (D.I. 8 ¶¶ 2-3) McKinney and Ford are both owners of Maya USA, a Delaware corporation with its principal place of business in Florida. (D.I. 20 at 3)

Dinardi began selling Maya bikinis in the United States in 2002. (D.I. 8 at ¶¶ 8-11) She had initially used Joe Market USA LLC to import Maya bikinis into the United States from Argentina. (*Id.* at ¶ 13) In September 2003, Ford and McKinney traveled to Argentina to present a business proposal. (*Id.* at ¶ 16) Dinardi, Ford, and McKinney thereafter reached an agreement and signed a letter of intent ("LOI") for the exclusive sale and distribution of Maya bikinis in the United States. (*Id.*)

The LOI had a two-year term and provided for automatic two-year extensions if sales goals were met. (D.I. 8, ex. A at 2) The exclusivity period commenced October 1, 2003, and defendants were to sell 6,000 units within the first 9 months, 15,000 units within 18 months, and 25,000 units within 24 months. (*Id.*) While Maya USA was allowed to use and promote the brand, Maya Argentina retained complete creative control of the brand's image. (*Id.* at 3)

On April 20, 2004, Dinardi filed for registration of the Maya trademark on the principal register of the United States Patent and Trademark Office. Said registration issued on October 9, 2007 with registration number 3306450. (D.I. 8 at ¶ 18)

2

Defendants set up a website, www.buymaya.com, to help with the marketing, promotion and sales of Maya bikinis. (D.I. 20 at 9-10) www.buymaya.com was connected with www.mayaswimwear.com to create a larger online presence, and rank higher in search ratings. (*Id.*)

Defendants failed to meet the sales goals as set fourth in the LOI; nevertheless, Dinardi continued the business relationship with them in order to sell and market Maya bikinis. (D.I. 8 at ¶ 19) Sales continued to decline, yet the relationship continued through 2010 when, according to plaintiffs, Ford and McKinney failed to book a booth at the Miami Trade Show (*Id.* at ¶¶ 27-28)

On October 13, 2010, Dinardi sent Maya USA a letter memo officially severing ties to defendants and ending any and all business relations with them. (*Id.* at ¶ 31) Despite this letter, defendants continued to sell Maya bikinis via their www.buymaya.com website. (*Id.* at ¶ 32) Consequently, plaintiffs sent a copy of the letter to Ford and McKinney directly on December 17, 2010. (*Id.* at ¶ 33) Defendants continued to operate their website and, on December 31, 2010, plaintiffs sent a copy of the letter to Network Solutions, plaintiffs' web host. (*Id.* at ¶ 34) Network Solutions took down the website from January 11, 2011 to January 19, 2011, but it is now fully operational. (*Id.* at ¶ 35)

Defendants use the Maya trademark with its stylized font and "Mayan" symbols at the top of their website. The logo has an orange hue to it, and is the largest text on the website. Similarly, plaintiffs display the logo in the same font and in the same relative position at the top of their website. Plaintiffs' version of the logo is white against

3

a black background, and the "Mayan" symbols are on the far right of the screen at the same level as the Maya logo.



Defendants' use of the mark     Plaintiffs' use of the mark

Nowhere on the site do defendants disclaim an association with Maya Agentina or do anything to imply that they are not the official Maya swimwear company.

### B. Christina Pinto

Christina Pinto, a former personal assistant to Ford, was terminated by defendants in 2010, and began working for plaintiffs in early 2011. (D.I. 14 ¶¶ 41-42) Pinto had not signed a non-compete or confidentiality agreement with defendants prior to her termination, nor did she have a written contract of employment. (*Id.* at ¶¶ 44-46) Defendants sent plaintiffs a letter demanding that they terminate Pinto, and cease using any and all customer lists and marketing materials that they obtained from her. (D.I. 14, ex. A) They also demanded that plaintiffs cease contact with any clients obtained from said customer lists. (*Id.*, ex. B)

### III. STANDARD OF REVIEW

#### A. Preliminary Injunction

Traditional rules of equity apply to requests for injunctive relief. *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *Id.* The grant of a preliminary injunction is considered an "extraordinary remedy" that should be granted

only in "limited circumstances." *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).

The moving party for injunctive relief must establish: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.* (citation omitted). The burden lies with the movant to establish every element in its favor or the grant of a preliminary injunction is inappropriate. *See P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005). If either or both of the fundamental requirements – likelihood of success on the merits and probability of irreparable harm if relief is not granted – are absent, an injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994).

### B. Motion to Dismiss for Failure to State a Claim

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A complaint does not

need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* at 1959. "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

"In reviewing a motion to dismiss, '[c]ourts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.'" *Collins & Aikman Corp. v. Stockman*, Civ. No. 07-265-SLR-LPS, 2010 WL 184074 at *3 (D. Del. Jan. 19, 2010) (*quoting Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "Certain additional materials may also be considered without converting a motion to dismiss into a motion for summary judgment (which generally cannot be ruled upon without providing a plaintiff a reasonable opportunity for discovery)." *Id.* "For instance, 'a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss **if the plaintiff's claims are based on the document. . . .**'" *Id.* (emphasis added) (citations omitted). As the Third Circuit has explained:

> The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond. When a **complaint relies on a document**, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.

6

*Pension Benefit*, 998 F.2d at 1196-97 (emphasis added). "The facts necessary to establish an affirmative defense must generally come from matters outside of the complaint. Thus, with some exceptions, affirmative defenses should be raised in responsive pleadings, not in pre-answer motions brought under Rule 12(b)." *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 (3d Cir. 2003) (citations omitted).

## IV. DISCUSSION

### A. Preliminary Injunction

Plaintiffs argue that the court should issue a preliminary injunction based on their trademark infringement and false designation of origin claims. (D.I. 9) For the reasons discussed below, plaintiffs show a likelihood of success on the merits for these claims, however, plaintiffs' requested relief is too broad. Therefore, plaintiffs' motion is granted-in-part and denied-in-part.

#### 1. Likelihood of success on the merits

##### a. Trademark infringement

##### (1) Standard

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994); *Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005).

A plaintiff proves trademark infringement by demonstrating that: (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) the defendant's use of its mark to identify goods or services is likely to create confusion concerning the origin

of the goods or services. *Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 279 (3d Cir. 2001); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000); *Fisons*, 30 F.3d at 472.

Likelihood of confusion exists when consumers viewing a mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. *Checkpoint*, 269 F.3d at 280; *Victoria's Secret*, 237 F.3d at 211; *Fisons*, F.3d at 472.

The Third Circuit has adopted a ten-factor test, known as the "*Lapp* test," to determine likelihood of confusion in the market. These factors are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of the consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or expect a prior owner is likely to expand into the defendant's market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983); *Sabinsa Corp v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d. Cir. 2010).

No single *Lapp* factor is determinative in a likelihood of confusion analysis, and each factor must be weighed and balanced against the others. *Kos. Pharms.*, 369 F.3d

8

at 709; *Checkpoint*, 269 F.3d at 280. The Third Circuit does not discount the strength of one factor because of the weakness of another factor. *Fisons*, 30 F.3d at 476. "Not all of the [*Lapp*] factors are present in every case." *Id.* at 476 n.11. However, if a court finds certain *Lapp* factors to be inapplicable or unhelpful in a particular case, the court should explain its choice not to employ those factors. *Kos Pharms.*, 369 F.3d at 711.

Even where a likelihood of confusion is found, the affirmative defense of the first sale doctrine or "trademark exhaustion" prevents a finding of liability when "a purchaser does no more than stock, display and resell a producer's product under the producer's trademark." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1073 (10th Cir. 2009); *Iberia Foods Corp. v. Romeo*, 1050 F.3d 298, 301 n.4 (3d Cir. 1998) ("According to the 'first sale' or 'exhaustion' doctrine, a trademark owner's authorized initial sale of its product into the stream of commerce extinguishes the trademark owner's rights to maintain control over who buys, sells, and uses the product in its authorized form."). Nevertheless, "the first sale doctrine does not protect resellers who use other entities' trademarks to give the impression that they are favored or authorized dealers for a product when in fact they are not." *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006). Additionally, the first sale doctrine does not apply when "notice that the item has been repackaged is inadequate," or "when an alleged infringer sells trademarked goods that are materially different than those sold be the trademark owner." *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 369-70 (6th Cir. 2005).

### (2) *Lapp* factors

In the case at bar, there is no dispute that plaintiffs own the Maya trademark and that it is distinctive and protectable. Instead, the parties focus their arguments around defendants' ability to sell genuine Maya bikinis on their website. During oral argument, plaintiffs argued that selling last year's product line "creates confusion in the marketplace." (D.I. 28 at 8:19-20) This is because in the fashion industry, "[s]tyles change quarter to quarter, week to week, day to day sometimes." (*Id.* at 8:13-15) However, plaintiffs do not cite a case for the proposition that selling last year's fashions violates the Lanham Act, especially when, as here, defendants do not claim that the products are this year's line.[2]

The true question before the court is whether defendants' use of plaintiffs' mark on the top of their website is actionable trademark infringement. For the reasons discussed below, it is.

### (a) The degree of similarity between the marks

Plaintiffs and defendants are using exactly the same mark. It is the "Maya" word, written in the same font, and using the same symbols. "Where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable." *Pappan Enters., Inc. v. Hardees Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998). Therefore, this factor favors plaintiffs.

### (b) The strength of the owners' mark

---

[2] Such a claim would give rise to a cause of action for false advertising under § 43(a) of the Lanham Act.

"To determine the strength of the mark, courts look to (1) the inherent features of the mark contributing to its distinctiveness or conceptual strength and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark" *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 185 (3d Cir. 2010). Conceptual strength falls into a spectrum of distinctiveness, classifying marks as either: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary/fanciful. *Id.* Generic marks describe a class of goods and can never obtain protected status. *In re Pennington Seed, Inc.*, 466 F.3d 1053, 1058 (Fed. Cir. 2006). Descriptive marks, including marks that use a person's name, require secondary meaning in order to obtain protection. *Tana v. Dantanna's*, 611 F.3d 767, 776 (11th Cir. 2010). Marks that are arbitrary, fanciful or suggestive are considered "inherently distinctive" and may obtain protection without proof of secondary meaning. *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

The Third Circuit has identified eleven non-exhaustive factors relevant to the factual determination whether an item has acquired secondary meaning:

    (1) the extent of sales and advertising leading to buyer association;
    (2) length of use;
    (3) exclusivity of use;
    (4) the fact of copying;
    (5) customer surveys;
    (6) customer testimony;
    (7) the use of the mark in trade journals;
    (8) the size of the company;
    (9) the number of sales;
    (10) the number of customers; and
    (11) actual confusion.

*E.T.Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 199 (3d Cir. 2008).

In the case at bar, the mark "Maya" is arbitrary when used in conjunction with the sale of bikinis and, therefore, is a strong mark. In addition, the mark has significant marketplace recognition as evidenced by magazine articles showing celebrities wearing Maya bikinis[3] and yearly trade show participation. Therefore, this factor favors plaintiffs.

### (c) The price of goods

The price of goods is high. The non-sale price of the bikinis on the parties' websites range from $185-$240. This factor favors defendants. *R.J.Ants Inc., v. Martinelli Enters., LLC,* Civ. No. 06-5669, - F. Supp. 2d -, 2011 WL 611809, at *13 (E.D. Pa. Feb. 18, 2011) ("if goods are expensive, or there is evidence that the average buyer exercises a certain level of care in making the purchase, or is a professional or commercial consumer, confusion is deemed less likely.").

### (d) The length of time defendants have used the mark without actual confusion

No party submitted information regarding actual confusion or a lack thereof. Therefore, this factor favors no party.

### (e) The intent of the defendants in adopting the mark

Defendants were associated with plaintiffs when they initially adopted the mark, therefore, at the time they initially adopted the mark, their intent was proper. Defendants continued to use the mark even after plaintiffs sent the cease and desist letters, although there is no indication that defendants continued using the mark with the intent to confuse the public. Because defendants were on notice that they were no

---

[3] http://www.mayaswimwear.com (follow "Press" hyperlink).

longer to use the mark, even though their original intent was proper, this factor somewhat favors plaintiffs.

### (f) Evidence of actual confusion

No party submitted information regarding actual confusion or a lack thereof. Therefore, this factor favors no party.

### (g) Whether the goods are marketed through the same sales channels

The goods are marketed through the same sales channels. The parties sell Maya brand bikinis over the internet, through their respective websites. In addition, the URLs of the parties' websites are nearly identical. Plaintiffs' e-commerce site is www.buymayaswimwear.com, whereas defendants' is www.buymaya.com. They also target the same retailers. (D.I. 8 at ¶ 44) Therefore, this factor favors plaintiffs.

### (h) The extent to which the targets of the parties' sales efforts are the same

"When the parties target their sales efforts to the same group of consumers there is a greater likelihood of confusion between the two marks." *Sabinsa Corp, LLC*, 609 F.3d at 188. In the case at bar, the targets of the parties' sales are the same. Both target women who are interested in fashionable yet moderately expensive bikinis. Therefore, this factor favors plaintiffs.

### (i) The relationship of the goods in the minds of the customers

The goods sold by the parties are identical, namely, Maya brand bikinis. Therefore, this factor favors plaintiffs.

13

### (j) Other facts suggesting that the consuming public might expect the prior owner to provide both products or expand into the market

Defendants' placement of the mark in the title bar of their website along with the URL suggests that defendants are either producers of Maya brand bikinis or an authorized retailer. Therefore, this factor favors plaintiffs.

### (3) Conclusion

Plaintiff has shown a likelihood of success on the merits for its burden of proving a likelihood of consumer confusion under the *Lapp* test. The balance of the *Lapp* factors tips in favor of plaintiffs due to the similarity of the marks and the positioning of the mark on defendants' webpage. This placement, along with defendants' URL, suggests to the consuming public that defendants either are the producers of Maya swimwear or are authorized distributors. This is not the case of a retail store with a different name selling a product on its website. Had defendants' store been called "Bargain Barrel Bikinis,"[4] and defendants used the Maya trademark either as plain text or in whole with a clear disclaimer that they were not an authorized retailer, plaintiffs would not have a cause of action because of the first sale doctrine. However, here, defendants' use of the mark "give[s] the impression that they are favored or authorized dealers for a product when in fact they are not." *Australian Gold*, 436 F.3d at 1241.

### b. Lanham Act § 43(a)

### (1) Standard

15 U.S.C. § 1125(a)(1)(a) provides in pertinent part:

---

[4] Assuming that Bargain Barrel Bikinis is not an actual store or a registered trademark owned by another company.

14

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The Third Circuit applies the same test for false designation of origin under § 43(a) as it does to causes of action for trademark infringement. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.* 166 F.3d 197, 202 (3d. Cir. 1999); *Primepoint, L.L.C. v. PrimePlay, Inc.*, 545 F. Supp. 2d 426, 431-32 (D.N.J. 2008).

### (2) Discussion

Because the court has already found that plaintiffs have a valid and protectable interest in the "Maya" trademark, and that defendants' use of said trademark is likely to cause confusion under the Third Circuit's *Lapp* test, the court also finds defendants liable for false designation of origin under § 43(a) of the Lanham Act.

### 2. Irreparable harm to plaintiffs

The court has determined that defendants' use of the "Maya" trademark constitutes trademark infringement and that plaintiffs have shown a likelihood success on the merits. Plaintiffs have demonstrated as well that defendants will continue to use the mark in a way that implies sponsorship absent an injunction, thus establishing a probability of irreparable harm. *Pan Am. World Airways, Inc. v. Flight 001, Inc.*, Civ. No. 14442, 2007 WL 2040588, at *7 (S.D.N.Y. Jul. 13, 2007).

### 3. Harm to defendants

Defendants presented no evidence as to the harm they would suffer if enjoined from using the mark in their current manner. That said, the court recognizes that defendants will likely lower in search rankings if they are no longer allowed to use the www.buymaya.com URL. This may make it more difficult to sell their remaining stock of Maya brand bikinis. However, this harm is less significant than the harm to plaintiffs that stems from consumers' confusion over defendants' status as the official Maya representative.

### 4. Public interest

The public interest concern in trademark infringement cases is "the interest in the prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharms.*, 369 F.3d at 730. "Having already established that there is a likelihood of consumer confusion created by the concurrent use of the . . . marks, it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon [defendants'] use of the marks would eliminate that confusion." *Optician's Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 198 (3d Cir. 1990). Accordingly, the court concludes that the public interest would be served by a preliminary injunction.

## B. Motion to Dismiss

### 1. Trademark Claims

Defendants' motion to dismiss plaintiffs' trademark claims is based on their defense of the first sale doctrine. (D.I. 47 at 5) As discussed above, defendants are allowed to sell their stock of Maya brand bikinis and, under some circumstances, even use the Maya trademark to do so. That being said, plaintiffs have pled a prima facie

case of trademark infringement for defendants' current use of the mark on their website.[5]

Plaintiffs pled that they own a valid and legally protectable mark, and that defendants are using said mark. (D.I. 14 at ¶¶ 9, 19, 31) Plaintiffs also implicitly state that defendants' use of the mark is likely to cause confusion, mistake or to deceive. (*Id.* at ¶ 31) Therefore, the court denies defendants' motion in this regard.

### 2. Tortious interference with contractual relationships

Defendants argue that plaintiffs have failed to show that they interfered with a contractual relationship because the two cease and desist letters that form the basis of the claim were sent to plaintiffs directly, and not to Pinto or to any customers. (D.I. 17 at 16-17) Furthermore, nothing has happened as a result of said letters. (*Id.*) Pinto still works for plaintiffs, and plaintiffs did not identify any actual or potential customer relationships that were harmed as a result of the letters. (*Id.*)

The parties do not dispute that Florida law governs plaintiffs' tortious interference with contractual relationship claims. The elements of tortious interference with a contract or business relationship are:

> (1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights;
> (2) the defendant's knowledge of the relationship;

---

[5] The court acknowledges that plaintiffs' complaint barely satisfies the Rule 8 pleading standards, and finds it remarkable that the word "confusion" appears nowhere on its face. However, given that the complaint "repeat[s] and reiterate[s] each and every allegation contained" in the preceding paragraphs for every count, there is enough pled in various parts of the complaint to plausibly state a claim for trademark infringement.

(3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform; and
(4) damage to the plaintiff resulting from the third person's failure to perform.

*Seminole Tribe of Florida v. Times Pub. Co., Inc.*, 780 So. 2d 310, 315 (Fla. Dist. Ct. App. 2001)

Plaintiffs' complaint satisfies the first two elements of tortious interference with a contractual relationship, namely that plaintiffs have a relationship with Pinto and various customers, and that defendants knew of said relationships as evidenced by the cease and desist letters that they sent to plaintiffs. (D.I. 14 at ¶¶ 48-52) However, plaintiffs did not adequately plead that these letters induced or otherwise caused Pinto or the customers not to perform under the business relationship. To the contrary, plaintiffs' recent letter to the court indicated that Pinto is still in a contractual relationship with plaintiffs, despite defendants' continued harassment. (D.I. 29) Furthermore, because plaintiffs did not plead that defendants induced or otherwise caused a third person not to perform, they cannot be damaged as a result of said failure to perform. Therefore, the court grants defendants' motion in this regard.

## V. CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is granted-in-part and denied-in-part as is defendants' motion to dismiss for failure to state a claim. Defendants may continue to sell Maya brand bikinis, but cannot claim or imply that they are the current line unless they actually are. Furthermore, defendants may not use plaintiffs' trademark at the top of their website, nor may they use the www.buymaya.com URL. Defendants must use a different business name for their website that does not involve the "Maya" trademark. Defendants may use the Maya trademark on their website to advertise the sale of Maya brand bikinis, but they must use the mark either as plain text or in whole with a clear disclaimer that they are not an authorized retailer. An appropriate order shall issue.