IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MAYA SWIMWEAR CORP., and )
CAROLINA DINARDI, )
                                              )
      Plaintiffs, )
                                              )
v. ) Civ. No. 11-59-SLR
                                              )
MAYA SWIMWEAR, LLC, DAVID )
MCKINNEY, and TODD FORD, )
                                              )
      Defendants. )

---

Neil Lapinski, Esquire of Elliot Greenleaf, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Daniel G. P. Marchese, Esquire of The Marchese Law Firm, LLC.

David E. Wilks, Esquire, of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware. Counsel for Defendant.

---

**MEMORANDUM OPINION**

Dated: April 5, 2012
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Carolina Dinardi ("Dinardi") and Maya Swimwear Corp. ("Maya Agentina") (collectively "plaintiffs") design, manufacture, and distribute an exclusive line of bikinis under the "Maya" brand name. (D.I. 14 at ¶¶ 8-13) David McKinney ("MicKinney"), Todd Ford ("Ford"), and Maya Swimwear LLC ("Maya USA") (collectively "defendants") originally sold Maya brand bikinis in the United States according to a 2003 Letter of Intent ("LOI") signed by the parties. (Id. ¶ 17) On January 15, 2011, after business discord came to a boil, plaintiffs filed suit against defendants. (D.I. 1) Plaintiffs amended their complaint on January 20, 2011 and again on February 3, 2011. (D.I. 7; 14) The second amended complaint: 1) seeks declaratory judgment that the business relationship between Maya USA and Maya Argentina has been severed (count I) (D.I. 14 at ¶¶ 33-36); 2) alleges violation of sections 1114(b) and 1125(a) of the Lanham Act, 15 U.S.C. § 1051 et. seq. for trademark violations (counts II & III) (Id. at ¶¶ 37-40); and 3) claims that defendants tortiously interfered with a contractual relationship by harassing Christina Pinto ("Pinto"), a former employee of defendants who now works for plaintiffs (count IV). (Id. at ¶¶ 41-52)

After a ruling on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss (D.I. 30), the parties engaged in settlement discussions. (D.I. 34; 37) Currently before the court is plaintiffs' motion to enforce their settlement agreement with defendants.[1] (D.I. 33) For the following reasons, the court grants plaintiffs' motion.

---

[1] Defendants McKinnley and Maya USA agreed to settle with plaintiffs after the filing of this motion. Accordingly, the motion to enforce is only pending aganist defendant Ford. (D.I. 46)

## II. BACKGROUND

### A. The Parties and The Contested Use of the Mark

Dinardi is the owner of Maya Argentina, a Florida corporation with its principal place of business in Buenos Ares, Argentina. (D.I. 14 ¶¶ 2-3) McKinney and Ford are both owners of Maya USA, a Delaware corporation with its principal place of business in Florida. (*Id.* at ¶¶ 4-6)

Dinardi began selling Maya bikinis in the United States in 2002. (*Id.* at ¶ 10) She had initially used Joe Market USA LLC to import Maya bikinis into the United States from Argentina. (*Id.* at ¶ 14) In September 2003, Ford and McKinney traveled to Argentina to present a business proposal to Dinardi. (*Id.* at ¶ 17) Dinardi, Ford, and McKinney thereafter reached an agreement and signed the LOI which gave Maya USA exclusive sale and distribution rights for Maya bikinis in the United States. (*Id.*) Defendants set up a website, www.buymaya.com, to help with the marketing, promotion and sale of the bikinis.

On April 20, 2004, Dinardi filed for registration of the Maya trademark on the principal register of the United States Patent and Trademark Office. The registration issued on October 9, 2007 with registration number 3306450. (*Id.* at ¶ 19)

Defendants failed to meet the sales goals set fourth in the LOI which meant the LOI expired in 2005; nevertheless, Dinardi continued the business relationship with defendants in order to sell and market Maya bikinis in the United States. (*Id.* at ¶ 20-22) Sales continued to decline, yet the relationship continued through 2010 when, according to plaintiffs, Ford and McKinney failed to book a booth at the Miami Trade

2

Show. (*Id.* at ¶¶ 28-30) In the wake of this failure, on October 13, 2010, Dinardi sent Maya USA a letter memo officially severing ties to defendants and ending any and all business relations with them. (*Id.* at ¶ 32) Despite this letter, defendants continued to sell Maya bikinis via their www.buymaya.com website. (*Id.* at ¶ 33) The current litigation resulted from plaintiffs' failed attempt to effectively sever relations with defendants.

## B. The Court's June 8, 2011 Ruling

In a June 8, 2011 memorandum opinion and order, the court granted in part and denied in part both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss. Specifically, the court held:

> 1. Plaintiffs' motion for a preliminary injunction (D.I. 8) is granted-in-part and denied-in-part, to wit:
>    a. Defendants may continue to sell Maya brand bikinis, but they cannot claim or imply that they are the current line unless they actually are.
>    b. Defendants are to refrain from using the URL www.buymaya.com.
>    c. Defendants are to refrain from using the Maya trademark at the top of their website.
>    d. Defendants are to use a different business name for their website that does not involve the "Maya" trademark.
>    e. Defendants may use the Maya trademark on their website to advertise the sale of Maya brand bikinis, but they must use the mark either as plain text or in whole with a clear disclaimer that they are not an authorized retailer.
> 2. Defendants' motion to dismiss for failure to state a claim (D.I. 16) is granted-in-part and denied-in-part, to wit:
>    a. Defendants' motion to dismiss counts one, two, and three is denied.
>    b. Defendants' motion to dismiss count four is granted.

(D.I. 31)

## C. Settlement Discussions

3

Following the court's ruling, the parties attempted to broker a settlement agreement. According to the plaintiffs, the parties agreed on a settlement following a June 20, 2011 telephone conversation. (D.I. 34 at 3-6) Plaintiffs point to a series of emails sent between counsel following the June 20th discussion in support of their position that an agreement on all essential terms was reached. (*Id.*) Specifically, in that June 20, 2011 email to defense counsel, plaintiffs' counsel stated the following:

> Gentlemen:
>
> My clients have given the "green light" to the settlement discussed earlier this afternoon. Kindly allow the letter to confirm this matter has resolved as follows:
>
> 1. The Order of the U.S. District Court for the District of Delaware of June 8, 2011, shall remain in place and in full force and effect and essentially can be deemed and or considered a final order.
>
> 2. Per the Order, the status quo shall be maintained.
>
> 3. The parties shall exchange mutual releases and mutual non-disparagment agreements.
>
> Thank you for reaching out. Neil and I will set out to tackle the Releases and Non-Disparagement Agreements and will work out the other fine points in the next five (5) business days.

(D.I. 34 at Ex. A) In a subsequent email from defense counsel to plaintiffs' counsel, dated June 30, 2011, the parties were arguing about whether defendants' website complied with the court's June 8, 2011 order. In that email, defense counsel stated:

> [T]he site is wholly compliant with the order and we resist our competitor's effort to select our client's marketing methods. I find it difficult to understand how this issue could be "an issue with finalizing" the settlement, since we have not yet received the draft settlement agreement that was promised some time ago. If your client does, in fact, desire to resolve this case as she has already agreed, please circulate a proposal at your first opportunity. If she intends to renege on her agreement, we will take the action we feel most appropriate.

4

(*Id.* at Ex. B) Just after this exchange, plaintiffs' counsel forwarded a proposed settlement agreement to defense counsel. (D.I. 37 at Ex. B) Defendants responded a few days later with a redlined version of the proposed settlement. (*Id.* at Ex. C) In response, plaintiffs' counsel provided defense counsel with what they deemed a stripped down version of the agreement that only contained the essential terms. (*Id.* at Ex. D) In that August 3, 2011 email, plaintiffs' counsel stated the following:

> [Defense counsel], In response to your revised version, we have attached a memorialization of our agreement. It contains only the essential terms agreed to on our telephone conversation of June 20, 2011 as confirmed in [plaintiffs' counsel] email of the same date. Since that date you have repeatedly reminded us that we have an agreement and admonished us that our client will suffer consequences should she renege. We agree. Please provide an executed copy by close of business today or we will file a motion to enforce the settlement agreement with the Court.
> Thank you[.]

(*Id.*) Negotiations broke down shortly thereafter when the parties could not agree on a final written settlement agreement.

## III. STANDARD OF REVIEW

"An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." *Rohm and Haas Elec. Materials, LLC v. Honeywell Intern., Inc.*, 2009 WL 1033651, at *4 (D. Del. 2009) (quotations and citation omitted). A district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it. *See Hobbs & Co. v. Am. Investors Mgmt., Inc.*, 576 F.2d 29, 33 & n.7 (3d Cir. 1978). Because motions for the enforcement of settlement agreements resemble motions for summary judgment, the court must employ a similar standard of

5

review. See Tiernan v. Devoe, 923 F.2d 1024, 1031-32 (3d Cir. 1991). Accordingly, the court must treat all the non-movant's assertions as true, and "when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." Id. at 1032 (internal quotation and citation omitted). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Courts should not summarily enforce purported settlement agreements, in the absence of an evidentiary hearing, where material facts concerning the existence or terms of an agreement to settle are in dispute. See id. at 1031 (quoting Garabedian v. Allstates Eng'g Co., 811 F.2d 802, 803 (3d Cir.1987)).

## IV. DISCUSSION

### A. Delaware Contract Law Requirements

"State law governs the construction and enforcement of settlement agreements in federal court." Excelsior Ins. Co. v. Pennsbury Pain Ctr., 975 F. Supp. 342, 349 (D.N.J. 1996); see also Parker-Hannifin Corp. v. Schlegel Elec. Materials, Inc., 589 F. Supp. 2d 457, 461 (D. Del. 2008) (citing Wilcher v. City of Wilmington, 139 F.3d 366, 372 (3d Cir. 1998)). Accordingly, "the court must determine whether the settlement agreement at issue is enforceable under Delaware law."[2] Leonard v. University of Delaware, 204 F. Supp. 2d 784, 787 (D. Del. 2002).

"Under Delaware law[,] a contract comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding

---

[2] The parties agree that Delaware law is controlling. (D.I. 34 at 6; D.I. 37 at 4-5)

6

circumstances, that the parties intended to be bound by their agreement on all essential terms." *Rohm and Haas*, 2009 WL 1033651, at *5 (quotations and citations omitted); *see also Schwartz v. Chase*, 2010 WL 2601608, at *4 (Del. Ch. 2010) (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)) ("When dealing with a motion to enforce a settlement agreement, the Court generally determines whether a binding settlement agreement arose by asking 'whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations and formed a contract.'") A contract contains all essential terms and is therefore enforceable when "it establishes the heart of the agreement;" it need not, however, contain all terms as some matters may be left for future negotiation. *Parker-Hannifin*, 589 F. Supp. 2d at 463. In other words, "[u]ntil it is reasonable to conclude, in light of all of these surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or . . . implicitly resolved, the parties have not finished their negotiations and have not formed a contract." *Leeds*, 521 A.2d at 1102. In short, "an enforceable contract exists where a reasonable person would conclude that the parties had reached a definite and final agreement on all essential terms." *Rohm and Haas*, 2009 WL 1033651, at *5.

### B. Analysis

Plaintiffs contend that defendants made an offer to settle during the June 20th call, and plaintiffs' June 20th email response was an acceptance of that offer. (D.I. 34

7

at 1; 3-5) In support of this contention, plaintiffs point the court to the June 20th, June 30th and August 3rd emails detailed above. (D.I. 34 at 3-5) The court agrees with plaintiffs' contention. The language of the June 20th email clearly suggests that defendants made an offer to settle and it was subsequently accepted by plaintiffs. Specifically, the emails states: "My clients have given the "green light" **to the settlement discussed earlier** this afternoon. Kindly allow this letter **to confirm this matter has resolved**."[3] Defendants' June 30th email confirms that the settlement offer was made and accepted. By claiming that they will be forced to take action if plaintiffs renege on their agreement, defendants acknowledged that a settlement had been reached. Furthermore, the fact that defendants never denied plaintiffs' insistence that a settlement had been reached - this insistence being evidenced in the June 20th and August 3rd emails - indicates that all sides agreed that settlement had been achieved. Accordingly, based upon these email exchanges, the court concludes that the parties objectively intended and assented to be bound by the terms set forth in the June 20th email.

Defendants, in reliance on the same set of email exchanges, contend that an agreement was not been reached. (D.I. 37 at 4) Defendants' brief appears to set forth

---

[3] It is worth noting that defendants open the facts section of their brief by acknowledging that they "initiated [the June 20th] telephone conference . . . and **proposed that the parties . . . agree** to conform their conduct to the June 8 Order, plaintiffs would dismiss this case, defendants would forgo their unasserted counterclaims and the parties would enter a settlement agreement and release containing mutually acceptable terms." (D.I. 37 at 2) While defendants later recharacterize their position as having "proposed a broad framework under which the parties might separate," (*Id.* at 5) the court finds this initial explanation noteworthy.

8

three arguments as to why a settlement agreement was not achieved or enforceable.[4] First, defendants argue that the parties explicitly agreed that a signed settlement agreement was required before any agreement would be considered enforceable. (*Id.* at 2; 6; 8) Second, defendants contend that the June 20th "agreement" could not be enforceable because it did not contain all essential terms. (*Id.* at 2-3; 5-6) Lastly, defendants assert that the June 30th settlement proposal sent by plaintiffs was a counteroffer. (*Id.* at 3; 6; 8) The court does not find defendants' arguments persuasive for the reasons discussed below:

### 1. Written agreement

Defendants assert on several occasions that the parties specifically agreed that a signed document was necessary in order to bind the parties. (*e.g. id.* at 2 ("[L]awyers on both sides of the case acknowledged that a definitive document stating the terms of the agreement would be required")) The law in Delaware on this issue is clear:

> There is no enforceable contract if the parties do not intend to be bound before a formal written agreement is drafted and signed. The fact that the parties intend to execute a formal agreement, however, is not dispositive. The question is whether the parties positively agree that there will be no binding contract until the formal document is executed.

*Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. Supr. 1998). In the absence of such an agreement, a contract's terms can take effect prior to the contract's memorialization and execution. *Id.*

While defendants at bar assert that memorialization and execution was a prerequisite to enforcement, they point the court to no evidence suggestive of this.

---

[4] Defendants have not offered three separate arguments in support of their position, but when the court reads through their brief, three distinct arguments emerge.

9

While the emails provided indicate that a written settlement agreement was contemplated, the emails do not suggest that enforcement was in any way contingent upon memorialization; in other words, the emails do not evidence any "positive agreement." Without some evidence suggesting this, there is so genuine issue of fact to resolve.

### 2. Essential terms

Defendants argue that all essential terms were not resolved as of the June 20th "acceptance." Defendants point to the language in the June 20th email - specifically, the reference to "other fine points" - and argue that that language clearly indicates that negotiations would continue.[5] Defendants go on to assert that "the incomplete status of the parties' negotiations is plainly illustrated in plaintiffs' draft settlement agreement . . . which introduced a variety of terms that had never been proposed, accepted or even mentioned on June 20." (D.I. 37 at 6) Specifically, a review of defendants' brief and their redlined version of plaintiffs' proposed settlement suggest that defendants were most concerned with: 1) the inclusion of, as opposed to reference to, the court's June 8, 2011 order in the recitals portion of the agreement; 2) the inclusion of a Delaware-based enforcement provision; 3) the inclusion of a provision assessing attorney fees against a party that breaches the agreement, and 4) the inclusion of an assignment provision. (Id. at 3; 7; Exs. C & F)

Initially, the court notes that the inclusion of the phrase "other fine points" does

---

[5] At page 6 of their brief, defendants note that "[plaintiffs' counsel] acknowledged that additional terms still required negotiation, **i.e.** "other fine points.'" (D.I. 37 at 6) On page 7, defendants say: "Using [plaintiffs' counsel's] terminology, there were fine points to discuss indeed." (Id. at 7)

10

not suggest, in the context of the parties' exchanges, that essential terms still needed to be resolved. To the contrary, as discussed above, the parties' exchanges evidence their clear intent to be bound by the terms set forth in plaintiffs' June 20, 2011 email.

The court also notes that a written settlement document will necessarily contain additional, boilerplate and conventional settlement language, not specifically addressed by the parties. *Loppert v. Windsortech, Inc.*, 865 A.2d 1282,1289 (Del. Ch. 2004). The inclusion of such language does not mean that essential terms remained outstanding or a counteroffer was made. *Id.* A settlement agreement will be enforceable so long as it contains all essential terms, i.e., it contains the heart of the agreement. *See supra*, pgs. 6-7.

Defendants' suggestion that plaintiffs' draft agreement evidences the continuing nature of the parties' negotiations is unpersuasive. The objective evidence indicates that all essential terms were addressed. The inclusion of, as opposed to reference to, the June 8, 2011 order is immaterial as the order speaks for itself no matter if it is explicitly included or not. Inclusion of language that maintains jurisdiction in Delaware,[6] assess attorney fees for breach and permits assignment of the agreement are routine and boilerplate additions that one would expect to find in a written settlement document.

In short, a reasonable person would not conclude, based upon the "other fine points" language and the state of the settlement proposal, that essential terms were

---

[6] Courts have jurisdiction to enforce settlement agreements in actions pending before them. *See supra, Hobbs & Co.*, pg. 5; *see also Fox v. Consolidated Rail Corp.*, 739 F.2d 929, 932 (3d Cir. 1984) ("It is well settled that a federal court has the inherent power to enforce and to consider challenges to settlements entered into in cases originally filed therein."). Therefore, this issue is implicitly resolved by reference to well-settled case law.

11

outstanding. Instead, on the whole, a reasonable person would conclude that all essential terms had been either explicitly or implicitly resolved through negotiations as of June 20, 2011.

### 3. Counteroffer

As discussed, the plaintiffs' draft settlement agreement was not a counteroffer simply because it contained non-essential (i.e., standard settlement agreement) terms. The court finds that a reasonable person would believe that an offer was made and accepted on June 20th and all parties believed that a settlement had been reached on essential terms as of that date. The June 30th settlement draft was an attempt to memorialize the agreement in accordance with the terms set forth by the parties on June 20th.

## V. CONCLUSION

For the reasons set forth above, the court grants plaintiffs' motion to enforce their settlement agreement with defendants, consistent with the essential terms of the agreement set forth in plaintiffs' June 20, 2011 email. (D.I. 33) An appropriate order shall issue.